UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHNNY JERMAINE SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIV NO. 07-cv-4167 |
| v. | § | |
| | § | |
| ERIC K. SHINSEKI, Secretary of | § | |
| Veterans Affairs, | § | |
| | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 12.) For the following reasons, Defendant's Motion must be granted.

### I.    BACKGROUND

Plaintiff Johnny Jermaine Smith is an African-American veteran with a disability, bi-polar disease and depression. Plaintiff was honorably discharged in 1999 after serving four years in the military. From 2002 until 2007, he worked as a program support clerk for the Department of Veterans Affairs (the "Department") at The Michael E. DeBakey Veterans Affairs Medical Center, Houston, Texas (the "Center"). Plaintiff was initially assigned to the patient access center ("PAC"), in the Business Office Service Line ("BOSL"). His supervisors were Jimmy Murphy, a black male, and Fern Taylor, a black female. At that time, the BOSL employed 115 people, 100 of whom were black. In the PAC, the position of program support clerk requires frequent personal contact with patients, patients' families, staff, and physicians. Plaintiff performed his duties within the Department's expectations until March 2006.

Plaintiff has suffered from recurrent major depression since 1998. After he started working at the Center, Plaintiff informed Murphy and Taylor of his depression and occasionally requested to attend stress management group sessions at the Center's Mental Health Clinic. In June 2005, his diagnosis changed from depression to reoccurring bipolar II disorder. (Smith Aff., July 10, 2007, 5:10-12; Doc. No. 12, Ex. B.) Plaintiff first received psychiatric treatment in November 2005. (*Id.*) In mid-March 2006, Plaintiff suffered a panic attack at work. He went to the VA Hospital where he was diagnosed with depression-related symptoms, admitted for treatment of bipolar II disorder, and hospitalized for four days.

Smith testified via affidavit that, after his hospitalization, he avoided groups of two to three people at work because of his bipolar disease. (Smith Aff. 4:16-5:6.) In addition, Plaintiff developed a phobia that his co-workers knew his private medical history; he also alleges that, in fact, people at the Center "went in my medical record" and asked him about it. (Smith Aff. 6:1-6:6; 9:2-9:13.) Plaintiff's wife, who also works for the Department, purportedly overheard others speaking about his medical condition. (*Id.* at 9:2-9:13.) On March 16, 2006, Plaintiff reported to the Information Security Officer that his medical record had been accessed and his bipolar disorder was known to the public. (*Id.* at 12:20-24; 14:1-5.) Partly because of these alleged disclosures, after his hospitalization, Plaintiff requested an accommodation and was moved to the physical rehabilitation medicine clinic ("PRMC") in late March 2006. (Pl. Am. Compl. at 4.) In that position he was required to enter financial data into a computer and answer the telephone.

On August 30, 2006, Plaintiff visited the Mental Health Clinic complaining of depression, anxiety, nervousness, and irritability. He reported that he was having problems on the job including confrontations with co-workers. (Medical Record of 8/30/2006, Doc. No. 12, Ex. C.) In late September 2006, Plaintiff began feeling nervous and agitated at work and requested work in a low contact area, i.e. with minimal human interaction, such as in building 110, located away from the main hospital. (Pl. Am. Compl. at 4-5; Smith Aff. 9:2-13.) Building 110 had fewer patients than the areas in which he worked. (Smith Aff. 9:14-22; 18:9-16.) In early October 2006, he reported for work there, but Carrie Wingwood, the supervisor at that department, a black woman, complained that she had volunteers to do the work and therefore had no work for him. (Smith Aff. 10:12-19.) Plaintiff believed that he could have performed his duties in Wingwood's department because he would have had no contact with patients there. (Smith Aff. 24:23-25:7.) Later that day, his PRMC supervisor, Jim Eddins, explained that Plaintiff needed to complete a reasonable accommodation request form and provide medical documentation before he could be transferred. (Pl. Am. Compl. at 5.)

Plaintiff's psychiatrist filled out the documentation and Plaintiff provided it to his supervisor at the Department. In a reasonable accommodation form, Plaintiff's psychiatrist, concluded that Plaintiff required complete isolation from all human contact and could not perform his job functions with or without an accommodation.[1] (Kauser Bashir, M.D., Reasonable Accommodation Determination, Doc. No. 12, Ex. H.) Joel Chavez, of Human Resources at the Department, required Plaintiff to submit to a fitness for duty examination by another doctor. This doctor, Dr. Jaime Ortiz-Toro reviewed the

---

[1] Plaintiff alleges that several answers on this determination form were altered to justify denying Smith the accommodation he sought. (Pl. Resp. at 11.)

reasonable accommodation determination and the program support clerk position description and determined, without conducting an independent examination, that Plaintiff could not perform his duties given his difficulties with human contact. (Jaime Ortiz-Toro, M.D. Report, Nov. 3, 2006, Doc. No. 12, Ex. J.) Catherine Byrd, Human Resources Labor Relations Specialist, claims that Human Resources and management officials attempted to find a position that involved no contact with co-workers, supervisors, or patients, but found none. (Catherine Byrd Aff., July 30, 2007, 5:21-25, Doc. No. 12, Ex. K.) Plaintiff purportedly sought transfer to the medical care cost recovery section of the BOSL, but that position also required significant human interaction. (Byrd Aff. 6:12-13.) Plaintiff asserts that his supervisors were unable to find him a low-contact job and refused to accommodate his disability. Plaintiff contends that, while his psychiatrist recommended he be placed in a low contact area, Dr. Ortiz-Toro equated low contact with no contact and, based on that inference, concluded that Plaintiff could no longer work for the Center.

In November 2006, Byrd sent Plaintiff a memorandum that explained that he was unfit for duty and could no longer perform the functions of his positions based on Drs. Ortiz-Toro and Bashir's reports. Byrd testified that Plaintiff was advised to take leave without pay and was given the option either to return to work with a medical clearance when he was fit for duty, or to apply for disability retirement benefits. (Byrd Aff. 7:7-18.) In her memorandum, Byrd strongly advised Plaintiff to take disability retirement and advised him that he would only be able to return to duty after providing medical evidence that he was fit for duty without restrictions. (Doc. No. 12, Ex. L.) Byrd testified via affidavit that at the time the decision was made, she did not know that Plaintiff had filed a

Privacy Act suit or that he had any prior EEO activity. (Byrd Aff. 3:11-21.) Byrd began working at the Center in November 2006, and therefore her first contact with Plaintiff was her receipt of Dr. Ortiz-Toro's letter, and the letter was her only basis for concluding that Plaintiff could not have any human contact. (Byrd Aff. 4:2-9; 5:6-12.)

On November 20, 2006, Plaintiff elected to take leave without pay and applied for disability retirement benefits. (Doc. No. 12, Ex. M; Smith Aff. 2:16-23.) In his application, Plaintiff explained that his major depression and bipolar II disorder restricted his ability to perform the major life activity of interacting with others. (Doc. No. 12, Ex. N.) His application was approved in May 2007. (Smith Aff. 21:6-11; Doc. No. 12, Ex. O.)

On November 22, 2006, Plaintiff contacted an EEO counselor and alleged race and disability discrimination, and reprisal. This was his first contact with the EEO. (Smith Aff. 12:1-2.) Plaintiff alleged that he could have been placed in a low contact area of the BOSL. On January 4, 2007, Plaintiff filed a complaint with the Department's Office of Employment Discrimination Complaints Adjudication.

On November 6, 2007, the agency issued its final decision and Plaintiff was informed of his right to appeal or to file a civil action. Plaintiff filed his complaint in this Court on December 7, 2007. Plaintiff now brings claims against Defendant Eric K. Shinseki,[2] in his capacity as Secretary of Veterans Affairs, under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16(c), the Americans with Disabilities Act of 1990 ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794. Plaintiff claims that he was

---

[2] The Honorable Eric K. Shinseki is now the Secretary of the Department of Veterans Affairs. Pursuant to Fed.R.Civ.P. 25(d)(1), when a public official is a party to an action and subsequently leaves office, that official's successor is automatically substituted as a party. Accordingly, Eric Shinseki is substituted in place of Gordon Mansfield, former Acting Secretary. The clerk of court is directed to amend the docket sheet to reflect this substitution.

subject to discrimination based on his race and disability, and that he was retaliated against for engaging in the protected activity of complaining about discrimination and other workplace violations. Plaintiff seeks reinstatement, an injunction against Defendant to prevent the Department from continuing to maintain discriminatory and retaliatory practices and policies, damages for back pay and front pay, other compensatory damages, fees and costs, and interest. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. SUMMARY JUDGMENT

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material

facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. TITLE VII RACE DISCRIMINATION CLAIMS

Defendant argues that Plaintiff cannot support his race discrimination claim because his supervisors were both African-American and the majority of the employees at the BOSL were black. Furthermore, Defendant contends that Jim Eddins, a white male, accommodated Plaintiff by transferring him to the PRMC which was the lowest contact area of all units within the BOSL. Defendant claims that Plaintiff told his supervisors that he could not perform the requirements of the job. Furthermore, Defendant contends that Plaintiff's psychiatrist opined that Plaintiff was unable to perform the functions of his job because of his medical condition, not his race. Plaintiff responds with evidence that he contends demonstrates that Defendant wrongfully discriminated against him on the basis of race: Mr. Shoemake, a white male with a disability, was similarly situated to Plaintiff, but he was accommodated, unlike Plaintiff. Shoemake is legally blind and was given a large computer monitor in a high patient contact area. (July 23, 2007, Fern Taylor Aff. 6:2-7:15, Doc. No. 12, Ex. E.)

### A. Standard

"Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Grimes v. Texas Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir. 1996). Title VII claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under Title VII, race) actually motivated the employer's

decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610 (1993); *Reeves,* 530 U.S. at 141. Title VII race discrimination claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> *McDonnell Douglas* instructs that the plaintiff must first establish a *prima facie* case of [race]. . . . Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action. . . . If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Bodenheimer v. PPG Industries, Inc.,* 5 F.3d 955, 957 (5th Cir. 1993); *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40 (5th Cir. 1996). If the plaintiff can establish that defendant's articulated reason is pretext, and if the *prima facie* case is sufficiently strong, a trier of fact may be able to conclude, without additional evidence, that the employer unlawfully discriminated. *See Reeves*, 530 U.S. at 148 (finding that the district court properly submitted the case to the jury). Such a showing will not always be sufficient: whether summary judgment is appropriate depends on numerous factors, including "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves*, 530 U.S. at 148-49).

To establish a prima facie case of wrongful termination for racially-motivated discrimination, the plaintiff must show  (i) he belonged to the protected class (African-American); (ii) he was otherwise qualified for his position; (iii) he was discharged or suffered some adverse employment action by the employer; and (iv) his employer subsequently hired people outside the protected class to fill the position, or he suffered

the adverse employment action because of his race. *St. Mary's Honor Center*, 509 U.S. at 506; *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004). A plaintiff can fulfill the fourth element if he proves that he suffered an adverse employment action under circumstances in which an employee of a different race would not have suffered that action, irrespective of the race of his eventual replacement, if there is one. *See, e.g.*, *E.E.O.C. v. Brown & Root, Inc.*, 688 F.2d 338, 340-341 (1982). Title VII encompasses employer liability for constructive discharge. *See Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).

If the defendant meets its burden of production, "the McDonnell Douglas framework—with its presumptions and burdens" disappears, and "the sole remaining issue" is "'discrimination vel non.'" *Reeves*, 530 U.S. at 142-43 (citing *St. Mary's Honor Center*, 509 U.S. at 510)). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (citing *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To satisfy that burden, the plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"[3] *Id.* (citing *Burdine*, 450 U.S. at 256). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271

---

[3] The plaintiff may also show that the defendant's articulated reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic ("mixed motive alternative"). *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). If a plaintiff shows that discrimination was a motivating factor in a mixed-motives case, defendant must then respond with evidence that the same employment decision would have been made regardless of discriminatory motivation. *Rachid*, 376 F.3d at 312 n.8 (citing 42 U.S.C. § 2000e-2(m)).

F.3d 212, 220 (5th Cir. 2001)); *see also Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (finding that an employer's inconsistent explanations for its employment decisions at different times may permit a jury to infer that the proffered reasons are pretextual).

Importantly, "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143 (citing *St. Mary's Honor Center*, 509 U.S. at 510; *Burdine*, 450 U.S. at 255, n. 10). On the other hand, even if the plaintiff presents some evidence that the defendant's legitimate non-discriminatory reason is false or a pretext, "such a showing will not always be enough to prevent summary judgment, because there will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet 'no rational factfinder could conclude that the action was discriminatory.'" *See Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citing *Reeves*, 530 U.S. at 148). As the Supreme Court has explained, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 509 U.S at 511. In a case in which plaintiff shows a defendant's legitimate, non-discriminatory reason is false, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Price*, 283 F.3d at 720 (citing *Reeves*, 530 U.S. at 148-49.); *see also Vadie v. Miss. State Univ.*, 218 F.3d 365, 374 n. 23

(5th Cir. 2000) (stating that a plaintiff can avoid summary judgment when the "evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [race] was a determinative factor in the actions of which the plaintiff complains").

### B. Analysis

Here, Plaintiff has met his burden as to element one of a prima facie case. He is African-American. He claims that Shoemake, a white male with a disability, was accommodated but Plaintiff was not. Plaintiff, however, has not established that he was qualified for the position or that he and Shoemake, who is legally blind, were similarly situated. Shoemake was given a large computer, whereas Plaintiff asked to be moved to another position.

According to the reasonable accommodation form supplied by Plaintiff's psychiatrist, Defendant determined that Plaintiff required complete isolation and could no longer fulfill the role of a program support clerk. Furthermore, even if Plaintiff was qualified, Plaintiff does not provide any evidence that Defendant's proffered non-discriminatory reason for not accommodating him—that Wingwood's department had no work for him—is pretext for race discrimination. Defendant's Motion must be granted as to Plaintiff's race discrimination claim.

## IV. REHABILITATION ACT CLAIMS

Defendant claims that Plaintiff has failed to demonstrate a prima facie case of disability discrimination because he proffers no evidence to prove that he was constructively discharged because of his disability. Defendant argues that human resources' ultimate determination that Plaintiff was not fit for duty was based on medical

evidence that he was unfit for the position because there was no position that would provide him complete isolation from all human contact. In addition, Defendant argues that there were no modifications or adjustments that could have allowed Plaintiff to perform his duties without human contact. Furthermore, Wingwood presented a legitimate, non-discriminatory reason for refusing to allow him to work in her department.

Plaintiff responds that someone manipulated his psychiatrist's reasonable accommodation determination. He also contends that Dr. Ortiz-Toro wrongfully decided that Plaintiff required no human contact, indicating that Defendant was dissembling to cover up a discriminatory purpose. In addition, he asserts that Carrie Wingwood had problems with people with disabilities.

### A. Standard

#### 1. Discrimination

To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show he: (1) was an individual with a disability; (2) was otherwise qualified; (3) worked for a federal agency; (4) suffered an adverse employment action; and (5) was denied the benefits of his employment or subjected to discrimination solely because of his disability. *See Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). The remedies, procedures and rights of Title VII govern Rehabilitation Act claims. *Pinkerton*, 528 F.3d at 517; 29 U.S.C. § 794a(a)(1). Furthermore, the Rehabilitation Act incorporates the standards used in Americans with Disabilities Act ("ADA") claims, claims that are subject to the Title

VII burden-shifting analysis. *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

Under the ADA, a disability is defined as, *inter alia*, "A physical or mental impairment that substantially limits one or more of the major life activities of such individual." 29 C.F.R. § 1630.2(g). Major life activities include working. 29 C.F.R. § 1630.2(i). A "qualified individual with a disability" means "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

## 2. Reasonable Accommodation

In addition, the ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless doing so "would impose an undue hardship" to the employer. 42 U.S.C. § 12112(b)(5)(A). *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 706 (5th Cir. 1997). The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See* 42 U.S.C. § 12111(8). In determining the essential function of a position, the Court must consider the employer's judgment as to what functions of a job are essential, and in particular, should evaluate any written description of the job. *See id.* The term "reasonable accommodation" may include-

> **(A)** making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

**(B)** job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

The employer's obligation to provide a reasonable accommodation is triggered by the employee's request for an accommodation. *See Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) (citing the ADA's implementing regulations). The responsibility for fashioning a reasonable accommodation is shared between the employee and the employer through an "interactive process." *See Id.* The ADA and Rehabilitation Act prohibit discrimination on the basis of disability and require reasonable accommodations, but do not require an employer to take affirmative action in favor of people with disabilities or to create a new job for them. *See, e.g., Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 808-10 (5th Cir. 1997); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996).

**B. Analysis**

As to his claim for disability discrimination, Plaintiff has bipolar II disorder. Plaintiff has established elements one, three, and four of his prima facie case. Plaintiff contends that he was qualified to work in Building 110 because he could work in a low contact area. Defendant responds that, as per Plaintiff's psychiatrist's evaluation, he was not qualified to work anywhere in the Center because all of the work requires human contact.

**1. Element Four: Constructive Discharge**

14

As to whether Plaintiff suffered an adverse employment action, Defendant argues that Plaintiff cannot claim constructive discharge because Byrd offered Plaintiff two choices: (1) take leave without pay, annual leave or sick leave, and then return to duty with medical clearance that he was fit for duty, or (2) pursue disability retirement. Plaintiff chose to quit his job and apply for disability retirement benefits, which he is currently receiving. Plaintiff responds that he was not presented with a choice to return to work because for him to do so, he would need to "provide medical evidence which was impossible because of his disability." (Pl. Resp. at 18.) Plaintiff therefore contends that since he could not return to work, he was forced to apply for disability retirement because he had no job or income. He asserts that this set of circumstances presented working conditions so intolerable that a reasonable employee would have resigned because he was choosing between retirement and being fired.

To demonstrate constructive discharge, a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). The Fifth Circuit considers a variety of factors to determine whether the plaintiff was constructively discharged.[4] Whether a

---

[4] Likewise, resignations by federal employees are presumed voluntary and the burden is on the plaintiff to show otherwise. *See, e.g., Terban v. Dep't of Energy*, 216 F.3d 1021, 1024 (Fed. Cir. 2000). In order to overcome this burden, the plaintiff must show (1) that the resignation or retirement was the product of misinformation or deception by the agency, (2) that the resignation or retirement was the product of coercion by the agency, or (3) the agency failed to correct erroneous information on which it has reason to know the employee is relying. *Id*; *Lawson v. U.S.P.S.*, 68 M.S.P.R. 345, 349 (1995). The plaintiff need not show that the agency intentionally deceived him about his retirement options, but must only show that a reasonable person would have been misled. *See Scharf v. Dep't of the Air Force*, 710 F.2d 1572, 1575 (Fed. Cir. 1983). In order to establish involuntariness based on coercion, the employee must show that the agency effectively imposed the terms of the employee's resignation or retirement, the employee had no realistic alternative but to resign or retire, and that the employee's resignation or retirement was the result of improper acts by the agency. *See Staats v. U.S.P.S.*, 99 F.3d 1120, 1124 (Fed. Cir. 1996). Courts narrowly construe coercion and even when the employee is faced with two unpleasant choices, courts need not find coercion. *See Staats*, 99 F.3d at 1124 (explaining that courts have found coercion when the agency threatens to take coercive action it knew was unsubstantiated or when the agency has taken steps against the employee simply to force the employee to quit); *Lawson v. U.S.P.S.*, 68 M.S.P.R. at 350 (MSPB 1995)

reasonable employee would feel compelled to resign depends on the facts of each case, but the Fifth Circuit considers the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). In evaluating these factors, the court must make a totality of the circumstances analysis with the awareness that an employee is not guaranteed a workplace free of stress, dissatisfaction, a feeling of being unfairly criticized, or difficult or unpleasant working conditions. *Miller v. Dep't Defense*, 85 M.S.P.R. 310, 322 (MSPB 2000). An ultimatum may constitute constructive discharge. *Jenkins v. State of La., Through Dep't of Corrections*, 874 F.2d 992, 996 (5th Cir. 1989) (explaining that had the employer forced the employee to choose between working on the Sabbath in violation of his religious beliefs and quitting, this ultimatum may have forced the employee to resign, constructively discharging him).

## 2. Constructive Discharge Analysis

Here, considering the circumstances surrounding Plaintiff's departure, only one or two of the factors considered by the Fifth Circuit are present. Plaintiff was offered the option of taking leave without pay, annual leave or sick leave for an indeterminate amount of time, thus losing his salary. Many of the other factors are not present.

---

(upholding an administrative determination that the employee was not coerced into retirement because the employee chose it rather than accept a demotion). Coercion is demonstrated when a reasonable person in the employee's position would have felt compelled to resign because the agency made the working conditions so intolerable or unpleasant. *See, e.g., Miller v. Dep't of Defense*, 85 M.S.P.R. 310, 314 (MSPB 2000) *Markon v. Dep't of State*, 71 M.S.P.R. 574, 577 (MSPB 1996).

Furthermore, while Plaintiff was presented with unpleasant choices, he was offered an option to seek disability retirement or to provide medical evidence that he was fit for duty.

Plaintiff contends that it would have been impossible for him to present such evidence because of his disability. On the other hand, Plaintiff asserts that he could have been accommodated by being placed in a low contact area. Consequently, if he was correct that he could have worked in a low contact area at the Center, he could have asked his psychiatrist for a reevaluation, and, if his assertion was correct, he could have been reinstated. Plaintiff did not seek another evaluation, but rather applied for disability retirement. On his disability retirement application, Plaintiff explained that his disability "restricts the ability to perform a major life activity as interacting with others per physician's statement," and "per Dr. Ortiz (Employee health) I cannot perform the duties as a program support clerk described in the functional requirement and working closely with others, based on my prior symptoms and prior hospitalizations." (Doc. No. 12, Ex. M.) Consequently, Plaintiff himself conceded that his disability interfered with the duties of a program support clerk. If Plaintiff believed that the reasonable accommodation form was altered to allow him to be discharged, he could have challenged the use of the form. The Department did not present him an ultimatum of retirement or discharge. As per Byrd's memo, it allowed him to take leave and seek a reevaluation or take retirement.

Taking the facts in the light most favorable to the non-moving party, the Court must assume that Plaintiff's reasonable accommodation form was altered. Question 15 on the form asks "Are production/performance standards an issue?" It appears that the box indicating "no" has been whited out, and the box "yes" is checked. The handwriting with

an explanation below the boxes appears to be, and a jury could conclude that it is, different from that on the first page of the form and different from Dr. Bashir's signature on page 15. The explanation below question 15 reads "employee is unable to interact with others per physicians statement." Furthermore, the answer to Question 19, may have also been altered. It reads: "[d]o any of the qualification standards result in the requestor being screened out on the basis of the impairment?" Only the box marked "yes" appears to be checked, but again there is a statement in a handwriting that may not be Dr. Bashir's that reads: "position requires interacting with patients visitors co-workers, … and the ability to effectively resolve issues." Lastly, question 31 is: "Can the requestor perform all of the essential functions of the position with or without reasonable accommodation(s) and without posting a direct threat to the requestor or others?," both "yes" and "no" boxes are checked but the "yes" box is scratched out. When deciding a motion for summary judgment, the Court does not sit as fact-finder. A jury could conclude that the form was altered, suggesting that someone at the Department was trying to mislead the decision-maker.

Based on this reasonable accommodation form, Dr. Ortiz-Toro concluded that he did not need to perform a fitness for duty examination. He relied on the form and the position description for the program support clerk in making his determination that Plaintiff was not qualified to work as a program support clerk, because the position requires continuous personal contacts. (Doc. No. 12, Ex. J, Ex. A.) Plaintiff, however, has presented evidence that, until March 2006, he performed his duties to the satisfaction of the department. After that time, he had disagreements with co-workers involving incidents in which they accessed his private medical files and questioned him about his

condition. He was moved to a different location, but his former co-workers continued to bother him there. He finally requested that he be moved to building 110, to work in the medical care cost recovery section away from his former co-workers. A reasonable jury could conclude that Ortiz-Toro made an incorrect determination that Plaintiff was not qualified and that Plaintiff could have been qualified to work in building 110.

Without more, however, it is difficult for the Court to conclude that Plaintiff was removed solely based on his disability. Like the ADEA and other anti-discrimination statutes, the ADA, and by analogy the Rehabilitation Act, cannot protect an employee from erroneous or even arbitrary employment decisions, only those unlawfully motivated. *Armstrong v. Turner Industries*, 141 F.3d 554, 560 n. 16 (5th Cir. 1998) (citing *Bienkowski*, 851 F.2d at 1508). In addition, Defendant presents a legitimate, non-discriminatory reason that Plaintiff was not accommodated even if he could have worked in building 110. Wingwood had no work for Plaintiff and had all the volunteers she needed to perform the work in her department. The ADA and Rehabilitation Act do not require that an employer create a new job for an employee. The definition of reasonable accommodation includes actions such as transferring an employee to a vacant position, but does not require that work be created for him. *See, e.g.*, *Foreman v. Babcock & Wilcox Co.*, 117 F.3d at 808-10; *Turco v. Hoechst Celanese Corp.*, 101 F.3d at 1094. Here, Wingwood's department did not have vacancies for him to fill.

Plaintiff also claims that Wingwood has a problem with people with disabilities in her department and "got rid" of a veteran with a disability. (Smith Aff. 32:9-22.) This evidence, however, is not probative. Plaintiff's subjective belief that these actions were motivated by discriminatory animus, without more, is insufficient evidence to support a

claim of discrimination. *See Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002). Plaintiff's Rehabilitation Act claim must be dismissed because he cannot prove that he was removed solely based on his disability because he was not reasonably accommodated.

## V. RETALIATION CLAIM

Defendant argues that Plaintiff cannot state a claim for retaliation because he never participated in protected EEO activities other than the claim preceding this lawsuit. Furthermore, Defendant argues that Plaintiff cannot establish reprisal because Byrd said she was not aware of any prior EEO activity. Plaintiff responds with excerpts from his affidavit in which he claims that he reported to a Information Security Officer that his medical record had been improperly accessed.

### A. Standard

A plaintiff may establish a prima facie case of unlawful retaliation by demonstrating: 1) he engaged in protected activity under Title VII, 2) his employer took an adverse employment action against him, and 3) a causal link exists between the protected activity and the adverse employment decision. *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008). A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). To establish a causal link, an employee "should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir.2003). If the plaintiff fails to establish that the final decision-maker had

this knowledge, his case fails. *See Ackel v. National Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).

The "'causal link' required in prong three of the prima facie case for retaliation is not as stringent as the 'but for' standard." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (citing *Long v. Eastfield College*, 88 F.3d 300, 305 (5th Cir. 1996)). Determining the causal link is "highly fact specific," and the court can look at the employee's past disciplinary record, whether the employer followed typical policy and procedure in its actions towards the employee, and the temporal relationship between the employee's conduct and the adverse action. *See Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994).

The *McDonnell Douglas* framework applies to Title VII retaliation claims. If a plaintiff makes a prima facie case, the burden shifts to the defendant to offer a legitimate reason for the employment decision. If the defendant makes such a showing, the burden shifts back to the plaintiff to show that the articulated reason was a pretext for retaliation. To demonstrate pretext, a plaintiff must show that the adverse employment action would not have occurred but for his protected conduct. *See Septimus*, 399 F.3d 601, 608 (5th Cir. 2005).

### B. Analysis

Here, Plaintiff has never previously filed an EEO complaint. The relevant human resources decision-maker, Byrd, began working at the center in November 2006. Byrd asserts, and Plaintiff does not contest, that Byrd had no knowledge of any prior EEO activity or his privacy act violation claims at the time she made the determination that he was unfit for duty. Even if Privacy Act violations were covered as protected activity

under Title VII, Plaintiff offers no evidence, other than his own assertions, linking his Privacy Act activity to the adverse employment action. The Court therefore assumes that Plaintiff's case is based on the temporal connection between the alleged protected activity and the adverse employment action. The Fifth Circuit has held that a five-month lapse between the protected activity and the alleged retaliatory act, without more, cannot establish a causal link. *Raggs v. Mississippi Power & Light Co.,* 278 F.3d 463, 471-72 (5th Cir. 2002). Plaintiff filed his complaint regarding access to his medical records in March 2006, and the adverse employment action did not occur until November 2006, more than five months later. Plaintiff has not met the burden of establishing a prima facie case of retaliation. Defendant's Motion as to this claim must be granted.

## VI. HARRASSMENT CLAIMS

Defendant argues that Plaintiff failed to exhaust his administrative remedies with respect to his harassment claim because they were not raised in preceding administrative action. Plaintiff does not respond to this argument, and it is not clear, based on Plaintiff's complaint, that he has brought a harassment claim. For completeness, however, the Court will address Defendant's contentions.

A federal employee who believes he has been discriminated against must contact an EEO officer within 45 days of the alleged discriminatory action, or within 45 days of the effective date of a personnel action. 29 C.F.R. § 1614.105(a). If the employee shows that he was not notified of the time limits, was not aware of them, or that he did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, or for reasons the EEO Commission considers sufficient, then the Commission shall extend the time limit. 29 C.F.R. § 1614.105(a). The EEOC promulgated the

regulations on time limits pursuant to its delegated powers under the civil rights statutes. *Henderson v. U.S. Veterans Admin.*, 790 F.2d 436, 439 (5th Cir. 1986).

The Fifth Circuit is split over whether EEO deadlines are prerequisites to suit (such that they are waivable) or are jurisdictional. *See Pacheco v. Mineta*, 448 F.3d 783, 788 n. 7 (5th Cir. 2006) (collecting cases but not resolving the split). The Fifth Circuit recently upheld a dismissal of a Title VII claim for failure to exhaust administrative remedies because the plaintiff did not timely contact the EEO officer. *Vidal v. Chertoff*, No. 07-40705, 2008 WL 4280320, *5 (5th Cir. Sept. 19, 2008). The *Vidal* court did not decide whether the district court had the power to equitably toll the time limits, because it concurred with the lower court that, even if the district court had the power to toll the time limit, it should not. *Vidal*, 2008 WL 4280320 at *3.

Equitable tolling generally applies in the following situations: when a case is pending between the parties in the wrong forum; when the claimant does not know or should know the facts giving rise to his Title VII claim; when the EEOC misleads the claimant about the nature of her rights under Title VII; and possibly, when the claimant is mentally incapacitated. *Manning v. Chevron Chem. Co.,* 332 F.3d 874, 880 (5th Cir.2003); *Hood v. Sears Roebuck and Co.*, 168 F.3d 231, 232 (5th Cir. 1999) (evaluating plaintiff's claim of mental incapacity and declining to toll on that basis); *Chappell v. Emco Mach. Works Co.,* 601 F.2d 1295, 1302 (5th Cir. 1979).

Here, Plaintiff has not contacted an EEO officer concerning the harassment claim and has therefore failed to exhaust his remedies. (EEO Counselor's Report, Doc. No. 12, Ex. P, at 5; Final Agency Decision, Doc. No. 12, Ex. R, at 1.) He has provided no

evidence that equitable tolling should be applied in this case. Plaintiff's harassment claim to the extent he intended to raise one, must be dismissed.

## VII.    CONCLUSION

Defendant's Motion for Summary Judgment, (Doc. No. 12), is **GRANTED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

**SIGNED** this 9th day of February, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE